# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 25 B 18108 |
| | ) | |
| ADAM SCOTT EAKINS, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Daniel R. Fine |

## MEMORANDUM OPINION AND ORDER ON UNITED STATES TRUSTEE'S MOTION TO DISMISS

Debtor Adam Scott Eakins filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. The United States Trustee ("UST") has moved to dismiss the case under 11 U.S.C. § 707(b). (Dkt. No. 30.) Section 707(b) authorizes a bankruptcy court to dismiss a Chapter 7 bankruptcy case if granting relief to an individual debtor whose debts are primarily consumer debts "would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1).[1]

The UST maintains that abuse is established here because Debtor, a relatively high-income earner, "seeks to retain numerous luxury items and continue to make substantial monthly payments on those items while paying nothing to his unsecured creditors." (Dkt. No. 30 at 3–4.) All told, he seeks to retain (and pay down debt on) inessential consumer goods valued at more than $402,000, while discharging personal liability on more than $82,000 of unsecured debt racked up on credit cards and from personal loans. (*Id.* at 4–5.)

---

[1] The UST sought alternative relief under 11 U.S.C. § 707(a), but because the UST's main argument carries the day, the Court will say (almost) nothing more about the UST's fallback position.

The items he seeks to retain include a recreational vehicle ("RV"), two jet skis, two snowmobiles, and a boat that by itself is valued at $185,000.

Debtor argues that dismissal is neither authorized nor warranted under these circumstances. He maintains that his debts are not primarily consumer debts—meaning that Section 707(b) by its terms cannot apply to him. (Dkt. No. 39 at 3.) He also argues that the totality of the circumstances does not support a finding of abuse. (*Id.* at 5.) In part, this is because Debtor and his non-filing spouse "reside in Florida where a Boat [sic] and jet skis are commonplace." (*Id*. at 3.) (To his credit, he makes no representation about the comparative popularity of snowmobiles in Florida.)

Debtor's arguments lack merit. His contention that his debts are not consumer debts appears at odds with the plain language of the Bankruptcy Code and—more importantly—is supported by nothing more than attorney say-so. Debtor's effort to direct his sizeable monthly income toward a flotilla of inessential consumer goods while relegating his general creditors to the murky depths is an abuse of Chapter 7 bankruptcy.

The UST's motion to dismiss will be granted unless Debtor files a motion to convert this case and seeks approval of a wage-earner's plan under Chapter 13. Debtor will have until August 31, 2026, to file a motion to convert. If he does not do so, the case will be dismissed.

## I.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. §§ 1334(b) and 157(b)(1). Motions to dismiss under 11 U.S.C. § 707 are core proceedings that bankruptcy courts have statutory and constitutional authority to decide. *In re Hozey*, 659 B.R. 337, 341 (Bankr. N.D. Ill. 2024).

2

## II.   Factual Background

The material facts are taken from the parties' briefs, Debtor's petition and schedules, and the exhibits that the parties filed in connection with the UST's motion. *See In re Jakovljevic-Ostojic*, 517 B.R. 119, 123 (Bankr. N.D. Ill. 2014). No factual dispute between the parties impacts the Court's analysis.

Debtor filed this Chapter 7 case in late November 2025. (Dkt. No. 1.) He resides in Florida but had lived in this district longer than any other in the 180 days before he filed. Thus, venue properly lies here. *See* 28 U.S.C. § 1408(1).

Along with his petition, Debtor filed Schedules, his Statement of Financial Affairs, and other related documents. (Dkt. No. 1.) These materials show that, at the time he filed bankruptcy, Debtor held property interests worth more than $516,000 (*id.* at 10); owed debts of about $484,000 (*id.*); and enjoyed monthly income of more than $14,200 (*id.* at 34).

Taking a closer look at the asset side of the balance sheet, Debtor's Schedule A/B shows that he and his non-filing spouse own, in a joint tenancy by the entirety, a house valued at $379,000. (*Id.* at 12.) There is very little equity in the house, located in Bradenton, Florida, but the non-filing spouse is the only one listed on the mortgage and note. (*Id.*)

Debtor's Schedule A/B lists several additional items of property and estimates the value of those items. The chart below identifies those items and—drawing on his Schedule D to provide a peek at the liabilities side of the balance sheet—includes information about how much he owes on them and the extent to which the corresponding debts are secured:

| ASSET DESCRIPTION | VALUE | OWED | UNSECURED PORTION |
|---|---|---|---|
| 2024 Polaris Slingshot | $30,000 | $0 | $0 |
| 2022 Coachman Pursuit 29SS recreational vehicle | $90,000 | $110,855.48 | $20,855.48 |
| 2023 Blackfin 252 DC (boat) | $185,000 | $179,320.73 | $0 |
| 2022 Skidoo Mach Z snowmobile | $14,000 | $15,585.21 | $1,585.21 |
| 2023 Renegade XRS snowmobile | $14,000 | $15,453.72 | $1,453.72 |
| 2022 Snopro trailer | $12,000 | $0 | $0 |
| 2024 Yamaha FXSV Ho jet ski with 2022 single trailer | $25,000 | $27,858.05 | $2,858.05 |
| 2024 Seado [sic] Fishpro 170 jet ski with 2023 double trailer | $25,000 | $28,585.92 | $3,585.92 |
| 2022 CanAm Maverick XRS Turbo | $20,000 | $24,392.81 | $4,392.81 |
| **TOTALS** | **$415,000** | **$402,051.92** | **$34,731.19** |

(Dkt. No. 1 at 13–14, 20–22.) In broad brushstrokes, it is fair to say that Debtor owns a substantial amount of property that can generally be regarded as recreational in nature. But the property is heavily encumbered. If a chapter 7 trustee were to liquidate the assets, doing so would not create value for the entire pool of creditors.

Debtor appears able to make payments on the property listed above because, each month, he brings home a tidy sum. His Schedule I states that he earns a gross monthly salary of $11,323.00. He works as "Director of Fiber Splicing" for a company called National Technologies. (*Id.* at 33–34.) His income is not the sole source of support for the household. Debtor's non-filing spouse is retired, but her pension brings in another $6,236.60 each month. (*Id.*) Their net monthly income adds up to $14,242.78. (*Id.* at 34.) They spend almost all of it.

Debtor's Schedule J lists monthly expenses totaling $14,054.55. (*Id.* at 35–36.) A handful of line items will prove important to the Court's analysis. Debtor's boat payment is $1,575.76 per month. (*Id.* at 36.) He also makes monthly payments for the two jet skis ($1,026.42); two snowmobiles ($915.49); and his RV ($852.35). (*Id.*) These expenses alone add up to $4,370.02 in monthly payments. Debtor also spends $1,000 per month on services for telephone, cell phone, Internet, satellite, and/or cable. (*Id.* at 35.) According to Debtor, he ekes out net monthly income of just $188.23. (*Id.* at 36.)

### III.   Procedural History

Shortly after Debtor filed for bankruptcy and a Section 341 Meeting of Creditors was held, the appointed Chapter 7 trustee filed a Report of No Distribution. (Dkt. No. 17.) As the title suggests, the report advised that there were no assets available for distribution to creditors. (*Id.*) The conclusion is unsurprising given the financial picture sketched out above. In a very real (if non-bankruptcy) sense, Debtor's biggest asset is his monthly income stream, and he directs that stream toward debts for assets that are heavily encumbered by liens (and in most cases completely underwater).[2]

Days after the Chapter 7 trustee filed her report, the Court authorized the UST to undertake a Rule 2004 Examination of the Debtor (Dkt. No. 18), and the Court later granted extensions of time for the UST to object to discharge (Dkt. Nos. 23 & 25). The UST filed this motion to dismiss on June 2, 2026. (Dkt. No. 30.) Debtor filed a response (Dkt.

---

[2] Because Debtor is an individual and not a corporate entity, his income is not an asset of the bankruptcy estate. 11 U.S.C. § 541(a)(6).

No. 39) and the UST filed a reply (Dkt. No. 42). The parties appeared in court on August 4, 2026, answering a handful of questions but otherwise resting on their papers.

The UST's motion is fully briefed and ripe for decision.

### IV.   Legal Standards

Bankruptcy protection "'is for the honest but unfortunate debtor who is seeking a fresh start, not a head start.'" *In re Schwartz*, 532 B.R. 710, 716 (Bankr. N.D. Ill. 2015) (quoting *In re Lombardo*, 370 B.R. 506, 511 (Bankr. E.D.N.Y. 2007)), *aff'd*, 799 F.3d 760 (7th Cir. 2015). Section 707 of the Bankruptcy Code is among the statutory provisions that help to police the distinction. *See also In re Krohn*, 886 F.2d 123, 127 (6th Cir. 1989) ("Congress, within the limits set by the Constitution, is free to deny access to bankruptcy as it sees fit.").

Section 707(b) of the Code authorizes a bankruptcy court to dismiss a Chapter 7 case if granting relief to "an individual debtor . . . whose debts are primarily consumer debts . . . would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). A presumption of abuse may arise based on the results of a "means test." Abuse is presumed if, "after deducting allowable expenses, the debtor's income is above a monetary threshold deemed sufficient to make a meaningful distribution to pre-petition creditors." *In re Plichta*, 589 B.R. 794, 800 (Bankr. N.D. Ill. 2018) (discussing 11 U.S.C. § 707(b)(2)).

In cases where the means-test-based presumption of abuse does not arise (or is rebutted), abuse is shown if the debtor filed his petition in bad faith, or if "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C.

6

§ 707(b)(3); *see also In re Ross-Tousey*, 549 F.3d 1148, 1161–62 (7th Cir. 2008), *abrogated on other grounds*, *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61 (2011). The UST bears the burden of proving that Debtor's financial situation makes this case abusive under Chapter 7. *Plichta*, 589 B.R. at 814; *In re Johnson*, 503 B.R. 447, 451 (Bankr. N.D. Ind. 2013).

## V.    Discussion

Granting relief to Debtor would constitute an abuse of Chapter 7. Although Debtor did not indicate that his debts are consumer debts, they squarely meet the definition. Based on the totality of the circumstances, it is nose-on-the-face plain that granting relief to Debtor would be an abuse of Chapter 7 of the Bankruptcy Code. Therefore, the case should be dismissed—and will be, unless Debtor files a motion to convert.

### A.    Debtor's Debts are Primarily Consumer Debts.

The first question for the Court to address is whether Section 707(b) has any chance of applying here at all, based on the type of debt with which Debtor is saddled. Section 707(b) can apply—and thus lead to a bankruptcy case getting dismissed—only for individual Chapter 7 debtors whose debts "are primarily consumer debts." 11 U.S.C. § 707(b)(1). The word "primarily" has been construed to mean "at the very least a majority." *In re Terzo*, 502 B.R. 553, 557 (Bankr. N.D. Ill. 2013). The Code defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).

Debtor fits the mold. His secured and unsecured debt add up to $484,421.87. (Dkt. No. 1 at 10.) His Schedule D lists secured debt totaling $402,051.92. (*Id.* at 20–23.) The secured amount includes various loans for the following items: a utility terrain vehicle

7

("UTV") that is described as a 2022 CanAm Maverick XRS Turbo; a boat that is described

as a 2023 Blackfin 252 DC; an RV described as a 2022 Coachman Pursuit 29SS; two jet skis

(both 2024 models, one made by Sea-Doo and the other by Yamaha); and two

snowmobiles (a 2023 model and a 2022 model). (*Id.* at 20–22.) Each of these items appears

in the chart in Part II of this Order.

Debtor does not even attempt to argue that the items are used for the operation of

a business to generate income—much less provide a supportive declaration or other

evidence that might corroborate such an assertion. Debts incurred without a profit motive

are generally considered consumer debt; debts incurred with a profit motive generally

are not. *E.g., In re Bizeau*, 668 B.R. 493, 497 (Bankr. W.D. Wis. 2025) (citing *In re Stewart*,

175 F.3d 796, 807 (10th Cir. 1999)). Recall that Debtor works as Director of Fiber Splicing

for a company called National Technologies. (Dkt. No. 1 at 33.) The company is located

in the landlocked village of Downers Grove, Illinois (*id.*), and no one suggests that

Debtor's boat, RV, snowmobiles, and jet skis have anything to do with fiber splicing. Nor

is there any indication that any of the assets were to benefit Debtor's prior employer, RTS

Fiber Optics, LLC, an Illinois company "designed . . . to gain access to local and state

government spending." (Dkt. No. 39 at 1–2.) The company was owned by Debtor's non-

filing spouse and is said to have cut back operations in spring 2024 before running its last

payroll in November 2024. (*Id.* at 2.)

Instead, Debtor maintains that, because his non-filing spouse is jointly liable on

loans from M&T Bank and Fifth Third Bank in the amount of $290,176.21, those debts (for

the boat and the RV) should be halved when calculating total debt. (*Id.* at 4.) His total

8

debt should accordingly be reduced to $111,875.71 for purposes of characterizing his debts as "primarily" consumer. (*Id.*; Dkt. No. 1 at 20–21.) Debtor also states that, because he has offered to return collateral (the CanAm Maverick XRS Turbo UTV) to another of his creditors, he should receive a further reduction of $24,392.81 from the total consumer debt amount. (Dkt. No. 39 at 4.) This should, Debtor figures, mean that his secured (consumer) debt adds up to just $87,482.90. (*Id.*)

Debtor, however, does not cite any authority for these propositions. The omission, an abandonment of his obligation to provide legal support for his arguments, disentitles him to relief. *Cnty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) (explaining that courts will neither "invent legal arguments for litigants" nor "accept as true legal conclusions or unsupported conclusions of fact" (citations omitted)); *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, No. 04-cv-346, 2010 WL 1325732, *1 (N.D. Ill. Mar. 30, 2010), *aff'd*, 683 F.3d 1356 (Fed. Cir. 2012) ("The adversary system of litigation relies on parties to make their cases by squarely presenting issues to trial courts and by citing legal authorities that situate a case within the case law on a given topic[.]").

Most courts would reject Debtor's argument even on its own terms because the calculation he conjures (in which $87,482 of $169,852.85 in debt is considered consumer debt) still means that 51.5% of his debt is consumer debt. *In re Jundt*, 623 B.R. 764, 770 (Bankr. D. Minn. 2021) ("[A] majority of courts have determined that 'primarily' means more than half of the total dollar amount of all debt."). But the more basic point is that, because Debtor did not support his arguments, he forfeited the issue.

The forfeiture likely leaves Debtor no worse for wear. The argument that debts shared with a non-filing spouse should be cut in half appears to be at odds with the plain language of the Bankruptcy Code. The Code's definition of "consumer debt" does not distinguish between individual debts and joint debts. *See* 11 U.S.C. § 101(8). Debtor does not argue that he is only half liable on the loans he and his wife are obligated to repay. Joint and several liability on a debt creates less risk for a lender but does not reduce the obligations of any joint loan recipient. That is the point. In a world of joint and several liability, a lender can look to a single obligor for full repayment and let the co-obligors argue about their proportionate share in a contribution action. *See*, *e.g.*, Restatement (Second) of Contracts § 289 (A.L.I. 1981). That is, joint and several liability may mitigate risk for Debtor's lenders, but it does not mean that *he* has any less skin in the game.

Where the language of a statute is plain, as it is here, courts enforce it. *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). The Code definition of consumer debt does not make the distinction Debtor asks this Court to enact. Accepting Debtor's argument would require the Court to read additional language into the statute—language that would add a scheme of debt-division into Code provisions that are already finely reticulated. Particularly in the absence of cited legal authority to support Debtor's favored interpretation, the Court respectfully declines Debtor's invitation to supplement the language of the Code.

The Section 707(b) analysis is "mainly arithmetical." *In re Schwartz*, 799 F.3d 760, 763 (7th Cir. 2015). The math here is at once straightforward and overwhelming: Debtor is saddled with $484,421.87 in total debt. Of that amount, $82,369.95, is unsecured debt

10

that the UST does not attempt to characterize as consumer debt. And $402,051.92 is secured debt that Debtor does not seriously contend is anything other than consumer debt. That means that consumer debt is almost exactly 83% of Debtor's total debt burden. Section 707(b) applies here.

**B.    A Word About Section 707(b)(2).**

Having determined that Section 707(b) applies, the next part of the analysis *should* center on the means test of Section 707(b)(2). The Supreme Court has described the means test as the "heart of . . . consumer bankruptcy reforms" that Congress enacted in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, commonly referred to as BAPCPA. *See Ransom*, 562 U.S. at 64. The means test helps to "ensure that debtors who *can* pay creditors *do* pay" creditors. *Id.*

The means test does so by taking a debtor's current monthly income and subtracting out "reasonably necessary expenses." 11 U.S.C. § 707(b)(2)(A)(ii). The calculations get highly technical, but among the takeaways is this: Chapter 7 abuse is presumed if an above-median-income debtor's monthly income (reduced only by specified categories of reasonably necessary expenses) multiplied by 60 is equal to or greater than 25 percent of nonpriority unsecured claims. 11 U.S.C. § 707(b)(2)(A)(i)(I). In more everyday terms, a debtor who makes more than most will generally not be entitled to Chapter 7 relief if a monthly surplus from a reasonable budget would allow him to pay "ordinary general creditors 25-cents on the dollar" over a five-year period. Douglas G. Baird, *The Elements of Bankruptcy*, 36–39 (7th ed. 2022) (describing the statutory scheme as well as its costs and benefits).

Neither the UST's motion nor Debtor's response addresses the means test. For reasons that are not obvious, Debtor represented at the time he filed his petition that his debts were not primarily consumer debts and that he was exempt from a presumption of abuse. (Dkt. No. 3.) He thus did not complete the means-test calculations. (*See id.*) That decision appears to have been problematic at best: Congress implemented the means test as a way of limiting judicial discretion to determine whether a filing was abusive. *See In re Henebury*, 361 B.R. 595, 603–04 (Bankr. S.D. Fla. 2007).

The UST, however, has not argued that Debtor or his attorney acted inappropriately to a degree that warrants further scrutiny under 11 U.S.C. § 707(b)(4), and so the Court will let sleeping dogs lie. *Cf. also Margolin v. Nat'l Ass'n of Immigration Judges*, 146 S. Ct. 1285, 1288–89 (2026). For purposes of this decision, the Court will operate as if the means-test presumption-of-abuse did not arise or was rebutted by Debtor.

Now, on to Section 707(b)(3) and the totality of the circumstances.

**C.     The Totality of the Circumstances of Demonstrates Abuse.**

Where the presumption of abuse from Section 707(b)(2) does not apply or is rebutted, bankruptcy courts are directed to consider "whether the debtor filed the petition in bad faith" or "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A)–(B). According to the UST, the totality of the circumstances demonstrate abuse here. The Court agrees.

The Code does not define the phrase "totality of the circumstances" as used in Section 707(b)(3). *See In re Grinkmeyer*, 456 B.R. 385, 389 (Bankr. S.D. Ind. 2011). The Seventh Circuit has not definitively fixed its meaning either, but it has suggested that

12

factors meriting consideration include whether: a debtor's debts are primarily consumer debts; the debtor's "income is high enough to enable [him] to repay a significant amount of debt without sacrificing a reasonable standard of living;" and debtor's income is at least as high as the median. *Schwartz*, 799 F.3d at 762–63; *see also In re Lowe*, 561 B.R. 688, 691 (Bankr. N.D. Ill. 2016) (stating that the "analysis is fact-intensive and performed on an individual case basis").

When courts look at the circumstances, a debtor's ability to meaningfully repay creditors frequently emerges as a central issue. *See In re Kruse*, 545 B.R. 581, 589 (Bankr. W.D. Wis. 2016); *In re Bacardi*, No. 09 B 25757, 2010 WL 54760, at *5–6 & n.4 (Bankr. N.D. Ill. Jan. 6, 2010). Other factors that are part of the holistic assessment include:

> (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; and (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition.

*Hozey*, 659 B.R. at 351 (quoting *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991)).

The circumstances here do not present a close case. As already noted, Debtor is saddled principally with consumer debts. His income far exceeds the median family income in the region. The UST contends, and Debtor does not question, that his monthly income is approximately 132% above the median income for a household size of two. (Dkt. No. 30, Ex. A at ¶ 9.) That income would be sufficient to allow him to repay a significant portion of his debt without sacrificing a reasonable standard of living.

Indeed, the UST has established by a preponderance of the evidence that Debtor could pay a meaningful dividend to his unsecured creditors under Chapter 13 with just a bit of "good, old-fashioned belt-tightening." *Krohn*, 886 F.2d at 128; *see also In re Holmes*, 496 B.R. 765, 777 (Bankr. M.D. Pa. 2013) (ability to fund chapter 13 plan is an important consideration in finding of abuse under Section 707(b)(3)); *In re Hilmes*, 438 B.R. 897, 911 (Bankr. N.D. Tex. 2010) (same).

In support of his motion, the UST attached the declaration of Jennifer Toth. (Dkt. No. 30, Ex. A.) Toth, an employee of the UST with an undergraduate degree in accounting, was tasked with reviewing Debtor's petition, Schedules, and Statement of Affairs. (*Id.* at ¶¶ 3–6.) Based on Debtor's Schedule J and Statement of Reaffirmation, Toth concluded that Debtor seeks to maintain ownership of his boat, RV, snowmobiles, and jet skis at a cost of approximately $4,369 per month. (*Id.* at ¶¶ 10–13.) If Debtor added that amount to his net monthly income of $188.23, he would have roughly $4,558 available to pay unsecured creditors. (*Id.* at ¶ 15.) The monthly surplus would total $273,480 over a 60-month period. (*Id.*) This means that Debtor would be able to pay $82,370 in unsecured debt—i.e., all of his scheduled unsecured debt—through a Chapter 13 plan in just 19 months ($4,558 x 19 = $86,602). (*Id.*)

Toth's math does not lie.[3] And even if Debtor did not part ways with his boat, RV, or jet skis, he could still make a big dent in his unsecured debts through modest

---

[3] One apparent shortcoming of Toth's analysis, however, is that she does not account for the unsecured portions of Debtor's secured claims. If Debtor surrendered the collateral securing those claims, the lienholders would end up with unsecured claims for the difference between what Debtor owes and the value of the collateral. Per the chart in Part II, surrendering the assets might

adjustments. Eliminating the monthly expense for his two snowmobiles would free up $915 per month that he could use to pay his unsecured creditors in a 60-month Chapter 13 plan. That monthly amount would total $54,900 over the life of the plan, allowing Debtor to pay more than 50% of his scheduled unsecured debt. (Dkt. No. 42 at 5.)

In his response brief, Debtor gets somewhat bogged down on whether the UST is fair to label Debtor's boat and jet skis as "luxury items." (Dkt. No. 39 at 3.) Debtor states that he and his wife reside in Florida and that boats and jet skis are "commonplace." (*Id.*) But whether Debtor's debts finance "luxury" items or not misses the point—or at least asks a not-quite-right question. The right question is whether Debtor's income "is high enough to enable [him] to repay a significant amount of debt without sacrificing a reasonable standard of living[.]" *Schwartz*, 799 F.3d at 763.

Could Debtor maintain a reasonable standard of living even if he gave up some of his consumer debt (and associated collateral) to pay unsecured creditors? On these facts, to ask the question is to answer it. Debtor does not argue that he uses his boat and jet skis to make money. Recreational watercraft are not essential to a reasonable standard of living. *E.g.*, *In re Boyle*, 412 B.R. 108, 112–13 (Bankr. W.D. N.Y. 2009) (finding that filing under Chapter 7 was an abuse where debtors sought to reaffirm their obligation to repay a loan for a boat instead of surrendering the boat and "redirect[ing] their boating expenses into a Chapter 13 plan"); *In re Deutscher*, 419 B.R. 42, 46 (Bankr. N.D. Ill. 2009)

---

increase the pool of nonpriority unsecured claims by more than $34,000. If so, the 19 months that Toth foresees as being required to pay general creditors could stretch to 26 months. This is still a short period of time to pay creditors in full, and so the wrinkle in the UST's calculations does not alter the Court's analysis.

15

(determining that a Chapter 7 petition was abusive based in part on debtor's decision to retain a yacht). The same goes for snowmobiles and RVs. In *Schwartz*, the Seventh Circuit suggested that chopping-block expenses should have included private-school tuition for children, a monthly car payment of $850 for a Range Rover, and tickets to Disney World. 799 F.3d at 761–62. The facts here are like *Schwartz*, only more so.

One additional consideration that Debtor highlights merits mention but does not alter the analysis. Debtor states that he filed this case because his previous employer, RTS Fiber Optics, LLC, went out of business. (Dkt. No. 39 at 5.) Courts do consider as part of the totality-of-the-circumstances analysis the extent to which unemployment (or some other calamity) precipitated the filing of a bankruptcy petition. *Hozey*, 659 B.R. at 351. But the consideration does not move the needle in this case.

As an initial matter, Debtor's Statement of Financial Affairs shows that in 2023 his income was $156,738; in 2024 the number was $130,993; and in 2025 he brought home $94,483. (Dkt. No. 1 at 38–39.) It is not obvious that an income reduction tipped him into bankruptcy. More important, Debtor's assertion that his unemployment caused his bankruptcy filing is not supported by any declaration or other evidence. (Dkt. No. 39 at 5.) Thus, the causal link is far from clear. Even if Debtor's unemployment contributed to his decision to file bankruptcy, it would not be a makeweight here, where Debtor's budget is unreasonable in the extreme.

It would be an abuse of Chapter 7 for Debtor, a relatively high-income earner with a considerable inventory of inessential goods, to obtain a discharge on more than $82,000 in unsecured debt when reasonable expense reductions would allow him to pay a large

chunk (or all) of his unsecured debt. To rule otherwise would be to permit a sort of bespoke bankruptcy, one in which a debtor simply picks and chooses the inessential property he wishes to keep (and keep paying for) while leaving tens of thousands of dollars' worth of unsecured debt behind.

At least on the facts here, the attempted maneuver does not jibe with the statutory scheme that Congress put in place to provide relief to individual debtors. Bankruptcy can provide a fresh start. But it is not designed to "assist those who are attempting to preserve a comfortable standard of living at the expense of their creditors." *Schwartz*, 532 B.R. at 716 (internal quotation omitted).

## VI.  Conclusion

Unless Debtor seeks to convert this case to Chapter 13, the case will be dismissed. Debtor must file a motion to convert by August 31, 2026. If no conversion motion is filed within that time, the UST's motion to dismiss the case under Section 707(b)(3) will be granted and the case will be dismissed. A separate order will be entered on the docket consistent with this opinion.

Because the UST has met his burden under Section 707(b)(3), the Court need not address the UST's alternate argument under Section 707(a) — nor Debtor's contention that rendering a ruling under the latter provision would require an evidentiary hearing.

August 13, 2026

_____

**Daniel R. Fine**
**United States Bankruptcy Judge**

17